[No. B205789. Second Dist., Div. Eight. Apr. 10, 2009.]

VENTURI & COMPANY LLC, Plaintiff and Appellant, v.
PACIFIC MALIBU DEVELOPMENT CORPORATION et al., Defendants
and Respondents.

[No. B206774. Second Dist., Div. Eight. Apr. 10, 2009.]

VENTURI & COMPANY LLC, Plaintiff and Respondent, v.
PACIFIC MALIBU DEVELOPMENT CORPORATION, Defendants and
Appellants.

**COUNSEL**

Law Offices of John A. Belcher, John A. Belcher and Nicholas W. Song for Plaintiff and Appellant and for Plaintiff and Respondent.

Leonard, Dicker & Schreiber, Lee T. Dicker and Michael R. Rogers for Defendants and Respondents and for Defendants and Appellants.

**OPINION**

**RUBIN, Acting P. J.**—Venturi & Company LLC appeals from the judgment dismissing its complaint after the court entered summary judgment for

respondents Pacific Malibu Development Corporation and Hermitage Estates Limited. Respondents cross-appeal from the court's order denying them their attorney fees. We reverse the order granting summary judgment, dismiss the cross-appeal for attorney fees as moot, and remand for further proceedings.

## FACTS AND PROCEEDINGS

In June 2003, appellant Venturi & Company LLC and respondents Pacific Malibu Development Corporation and Hermitage Estates entered into a contract involving development of a high-end resort on undeveloped property on the Bahamian island of Little Exuma. Under the contract, appellant agreed to serve as a financial advisor and find financing for the Little Exuma project through a private placement of equity, preferred stock, debt securities, or a combination of those financial instruments, which collectively the contract called "Securities." The contract described appellant's services for respondents as follows: "In connection with its engagement hereunder, [appellant] shall: [¶] a. review the proposed development costs, business operations and financial requirements of the Project; [¶] b. assist [respondents] in preparing information materials and documents with regard to a Placement, including an executive summary, confidential information memorandum, term sheets and related due diligence information in connection with the Project; [¶] c. assist [respondents] in formulating a marketing strategy for the Securities, including identifying and contacting selected parties with regard to a Placement, scheduling meetings with such parties and participating in meetings and/or relevant discussions relating thereto; [¶] d. advise [respondents] as to the strategy and tactics of negotiations in connection with the Placement and, if requested, assist in the negotiations with the related parties; and [¶] e. provide such other financial advisory and investment banking services as may be mutually agreed upon by [respondents] and [appellant]."

Respondents agreed to compensate appellant with two possible fees. First, respondents promised upon "completion of a Placement" to pay appellant a "Monthly Advisory Fee" of $30,000 for at least three months "at the close of any such Placement." Second, respondents promised to pay a "success fee" to appellant "promptly upon consummation of any Placement of Securities." The amount of the success fee, which appellant describes as akin to a finder's fee, depended on appellant's role in the consummated placement. If appellant either introduced (the contract's word was "identified") respondents to the party who provided financing, or participated in "active negotiations" with that party, respondents promised to pay appellant a success fee equal to 5 percent of the placement's proceeds. If, on the other hand, appellant neither identified the party providing financing nor negotiated the financing, then respondents owed appellant only 1 percent of the placement's proceeds. Thus, appellant was entitled to some payment under the contract even if appellant did not secure financing for the project.

After signing the contract, appellant contacted more than 60 potential sources of financing for the project. Two of those sources—Lou Reese Investor Group and Blenheim Partners—signed "term sheets" with respondents. Neither of them, however, finally committed to provide financing and, in the end, respondents did not receive financing from any source that appellant had identified.

Respondents terminated the contract in January 2005. Two months earlier, however, respondents had signed a term sheet with the Talisker Group. Appellant was not involved in respondents' negotiations with the Talisker Group or in the placement of Securities with that group. Nevertheless, appellant claimed the contract's provision for a success fee entitled appellant to compensation following the placement. When respondents refused to pay appellant's fee, appellant sued respondents. Appellant's operative third amended complaint alleged respondents' refusal to pay the fee breached their contract. The complaint also alleged a cause of action for quantum meruit for the reasonable value of appellant's services.[1]

Respondents moved for summary judgment. They argued appellant had provided the services of a real estate broker by soliciting financing for the Little Exuma project, yet did not have a broker's license. Thus, respondents asserted, section 10136 of the Business and Professions Code barred appellant from receiving any compensation as an unlicensed broker. (Bus. & Prof. Code, § 10136 [only licensed real estate broker may receive compensation for real estate brokerage services].) Appellant opposed summary judgment. It argued that one of its managing principals, Jane Venturi, had a real estate sales license and was employed by a real estate broker (whom appellant did not identify) when respondents signed their term sheet with the Talisker Group, the document that triggered appellant's right to a fee.

The court entered summary judgment for respondents. The court found appellant had acted as a real estate broker when working on the Little Exuma project. (See Bus. & Prof. Code, § 10131 discussed below.) The court pointed, however, to appellant's lack of evidence that Jane Venturi's unnamed broker had employed or authorized her to work on the project. Hence, appellant did not present a triable issue of fact that it was a licensed real estate broker entitled to compensation. The court entered judgment for respondents but denied respondents' request for attorney fees. This appeal (and respondents' cross-appeal for attorney fees) followed.

---

[1] Appellant also alleged tort causes of action for fraud, concealment, and promissory fraud, but the court sustained respondents' demurrer to those causes of action without leave to amend. On appeal appellant does not argue the trial court erred in dismissing the tort causes of action; therefore, we do not discuss them.

## DISCUSSION

Business and Professions Code section 10131 defines a "real estate broker" as one who: "does or negotiates to do one or more of the following acts for another or others: [¶] (a) . . . solicits prospective sellers or purchasers of . . . or negotiates the purchase, sale or exchange of real property . . . . [¶] . . . [¶] (d) Solicits borrowers or lenders for or negotiates loans . . . or performs services for borrowers or lenders or note owners in connection with loans secured directly or collaterally by liens on real property . . . . [¶] (e) Sells or offers to sell, buys or offers to buy, or exchanges or offers to exchange a real property sales contract, or a promissory note secured directly or collaterally by a lien on real property . . . ." (§ 10131.)[2]

Under its contract with respondents, appellant agreed to help find possible sources of financing for the Little Exuma project.[3] Appellant also agreed, if respondents asked, to help negotiate the placement of Securities to procure that financing.[4] Such services could constitute those of a real estate broker, especially if appellant negotiated on respondents' behalf. (See § 10131 [broker "does or negotiates to do one or more of [enumerated] acts for another . . ."].) But the contract also called for appellant to provide services different from those of a real estate broker. For example, appellant agreed to review the project's costs and financial requirements. (Contract par. 1a.) Appellant also agreed to help respondents prepare information materials and documents related to financing the project, and to help formulate a marketing strategy to secure financing. (Contract par. 1b, c.) Finally, appellant also agreed to provide mutually agreed-upon financial advice and investment banking services. (Contract par. 1e.)

■ The court correctly ruled appellant could not receive compensation for providing real estate broker services to respondents because appellant was not a licensed broker. (§ 10136 [broker's license required to collect compensation for broker services].) But decisions such as *Lindenstadt v. Staff Builders* (1997) 55 Cal.App.4th 882 [64 Cal.Rptr.2d 484] (*Lindenstadt*), establish that the court erred in denying appellant compensation to the extent appellant's services were not those of a real estate broker. In *Lindenstadt*, the parties entered into 25 to 30 written agreements in which the plaintiff promised to help the defendant find businesses for possible acquisition. (*Id.* at p. 885.)

---

[2] All undesignated statutory references are to the Business and Professions Code.

[3] See contract paragraph 1c (appellant shall "assist the Company in . . . identifying and contacting selected parties with regard to a Placement, scheduling meetings with such parties and participating in meetings and/or relevant discussions relating thereto").

[4] See contract paragraph 1d (appellant shall "advise the Company as to the strategy and tactics of negotiations in connection with the Placement and, if requested, assist in the negotiations with the related parties").

(For historical reasons real estate broker services cover not only real estate, but also "business opportunities." (*All Points Traders, Inc. v. Barrington Associates* (1989) 211 Cal.App.3d 723, 728 [259 Cal.Rptr. 780].)) After the plaintiff found a number of such businesses, the defendant refused to compensate the plaintiff. (*Lindenstadt,* at p. 886.) The defendant cited the plaintiff's performance of broker's services without a license as justifying its refusal to pay. On appeal, the appellate court rejected the defendant's sweeping contention that the plaintiff's unlicensed services for *some* business opportunities meant the plaintiff could not receive compensation for *any* business opportunity. (*Id.* at pp. 888–889, 893–894.) Rather, the appellate court directed the trial court to examine individually each business opportunity to determine whether the plaintiff acted as an unlicensed broker for that transaction or instead provided only services for which it did not need a broker's license.[5]

Likewise here, the contract called for appellant to provide a range of services, some apparently requiring a broker's license, others seemingly not. Moreover, and more to the point, appellant denied having been involved in arranging, let alone negotiating, respondents' placement of Securities with the Talisker Group for which appellant claimed a "success fee" under the contract's provision awarding it a fee even if it had no role in procuring the financing. Thus, triable issues existed involving the extent to which appellant provided either unlicensed broker services or, alternatively, nonbroker services for which it did not need a license.[6] (Accord, *Marathon Entertainment, Inc. v. Blasi* (2008) 42 Cal.4th 974, 990–993 [70 Cal.Rptr.3d 727, 174 P.3d 741] [severability allowed partial enforcement of personal manager employment contract when license required for some, but not all, services rendered under the contract].)

---

[5] Comparison of different provisions in the Business and Profession Code dealing with real estate brokers and contractors supports *Lindenstadt*'s approach. Section 7031 prohibits unlicensed building contractors from suing to recover fees for unlicensed services *and* permits a contractor's client to recover "all compensation paid to the unlicensed contractor." (§ 7031, subd. (b).) In contrast, the code contains no similarly draconian possibilities for unlicensed real estate brokers. While section 10136 prohibits an unlicensed broker from suing to collect broker's fees, the statute does not state a client may force a broker to disgorge any fees previously paid.

[6] Accord, *Lindenstadt, supra,* 55 Cal.App.4th at page 886, footnote 3 (" ' "[T]he rule is well established that one who simply finds and introduces a prospective [buyer] to a person who wishes to [sell] his property need not be licensed by the state in order to recover a commission for his services. Such an intermediary is protected by the so-called 'finder's' exception to the real estate licensing act." . . . [¶] The line between brokers and finders is based on whether the person in question has engaged in any negotiating to consummate the transaction. . . . "The finder is a person whose employment is limited to bringing the parties together so that they may negotiate their own contract . . . ." ' [Citation.]").

Respondents try to distinguish *Lindenstadt*. They note that decision involved 25 to 30 separate written agreements covering scores of potential business opportunities. Such circumstances, according to respondent, permitted the trial court to meaningfully parse each transaction. Here, in contrast, the contract between appellant and respondents involved only one property, rendering it impossible, in respondents' view, to untangle broker from nonbroker services.

We find respondents' attempted distinction to be unavailing. Even though the contract here involved developing only one property, it envisioned appellant directing its efforts toward many potential sources of financing. (Accord, *Marathon Entertainment, Inc. v. Blasi, supra*, 42 Cal.4th at pp. 980–981 [severability applied to unlicensed talent agent's contract to provide range of services to actress].) As to some of those sources, appellant may have crossed the line into performing broker services. But for other sources, appellant may have provided only financial and marketing advice for which it did not need a broker's license. (See, e.g., *Executive Landscape Corp. v. San Vicente Country Villas IV Assn.* (1983) 145 Cal.App.3d 496, 499–500 [193 Cal.Rptr. 377] [statute barring unlicensed contractor from receiving fees for some services did not prohibit recovery for work not within scope of licensing statute].) And finally, as to the Talisker Group, appellant may have provided even less assistance than financial and marketing advice, given that appellant denied involvement with the group. Whether appellant crossed the line into providing broker services is thus a triable issue of fact that we cannot resolve on summary judgment.

■ For the parties' guidance following remand, we address appellant's contention that it was entitled to compensation for *all* services it provided to respondents. Appellant is mistaken, because it did not have a broker's license, and therefore was not entitled to compensation for broker's services. Appellant contends it was properly licensed because one of its managers, Jane Venturi, obtained a real estate sales license in February 2004. Thus, she, and appellant claims by extension itself, were licensed when respondents purportedly breached the contract by refusing to pay appellant months later for the Talisker Group placement.[7] Jane Venturi's sales license was not, however, sufficient; only a licensed broker may provide broker services. (§ 10136; accord, § 10132 [real estate salesperson is employed by a licensed real estate broker].) A sales license does not permit its holder to represent another unless the salesperson acts under a broker's authority. (*People v. Asuncion* (1984) 152

---

[7] Appellant's line of reasoning relies on *Estate of Lopez* (1992) 8 Cal.App.4th 317 [10 Cal.Rptr.2d 67]. That decision is distinguishable from appellant's circumstances because the broker's license in *Lopez* had merely lapsed when the parties entered into their contract, but was renewed before the contract's completion. (*Id.* at p. 319.) Here, however, Jane Venturi had no license when appellant entered into its contract with respondent, and the license she later received was a sales license, not a broker's license.

Cal.App.3d 422, 425 [199 Cal.Rptr. 514].) Jane Venturi notes that licensed broker Clay Herman Realtor, Inc., employed her. Her employment does not change the result, however, because the broker under whose authority a salesperson may act must itself be a party to the real estate contract, which was not the case here. (See generally 2 Miller & Starr, Cal. Real Estate (3d ed. 2000) § 5:51.)[8]

Appellant also contends that its second managing principal, Matthew Venturi, had securities licenses that exempted appellant from needing a broker's license. In 1979, Matthew Venturi passed the Series 7 General Securities Representative Examination. And in 1999, he passed the Series 63 Uniform Securities Agent State Law Examination. In support of its claimed exemption, appellant cites section 10133.1, subdivision (a)(9). That statute states that a licensed securities broker or securities dealer does not need a broker's license "in connection with a transaction involving the offer, sale, purchase, or exchange of a security representing an ownership interest in a pool of promissory notes secured directly or indirectly by liens on real property . . . ." (§ 10133.1, subd. (a)(9).) Appellant's reliance on this exemption is misplaced in two ways. First, the court found appellant offered no evidence that the tests Matthew Venturi passed meant he was "licensed as a securities broker or securities dealer." Second, the exemption applies to transactions involving a pool of promissory notes, but appellant offered no evidence that was the nature of the transaction here.

## RESPONDENTS' CROSS-APPEAL

Claiming they were the prevailing party, respondents moved for their attorney fees after the court entered summary judgment for them. Appellant objected to respondents receiving their attorney fees because respondents were, in appellant's view, misapplying the contract's indemnification clause in seeking their fees. Concluding that the indemnification clause was not an attorney fee provision, the court agreed with appellant and denied respondents' motion for their fees. Respondents cross-appealed from the court's order. Because we have reversed summary judgment for respondent and are returning this matter to the trial court for further proceedings, respondents' cross-appeal is moot as there is no longer a prevailing party.

---

[8] 2 Miller and Starr, California Real Estate, *supra*, section 5:51, page 193 states: "Although the salesperson may negotiate the listing agreement with the property owner, all listings must be in the name of the broker. Only a broker can enter into a listing agreement or other employment agreement that provides for compensation. A real estate salesperson is strictly the agent of the broker. The salesperson cannot contract in his or her own name and cannot accept money from any person other than the broker under whom he or she is licensed. (Fn. omitted.)"

## DISPOSITION

The judgment for respondents Pacific Malibu Development Corporation and Hermitage Estates Limited is vacated, and the trial court is directed to enter a new order denying respondents' motion for summary judgment. Respondents' cross-appeal from the court's order denying respondents their attorney fees is dismissed as moot. Appellant Venturi & Company LLC to recover its costs on appeal and cross-appeal.

Bigelow, J., and O'Neill, J.,* concurred.

---

*Judge of the Ventura Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.