[No. B215487. Second Dist., Div. Seven. June 14, 2010.]

GREENLAKE CAPITAL, LLC, Plaintiff and Appellant, v.
BINGO INVESTMENTS, LLC, et al., Defendants and Respondents.

732

**COUNSEL**

Law Offices of John Belcher, John A. Belcher and Nicholas W. Song for Plaintiff and Appellant.

Parker, Milliken, Clark, O'Hara & Samuelian, Brenton F. Goodrich and Gary Ganchrow for Defendants and Respondents.

**OPINION**

**PERLUSS, P. J.**—GreenLake Capital, LLC (GreenLake) appeals from the judgment entered after the trial court granted summary judgment in favor of Bingo Investments, LLC and Centurion Financial Group, LLC (collectively Bingo) in this action brought by GreenLake to recover its fee for identifying and procuring a $150 million credit facility in favor of Bingo. Bingo contends GreenLake forfeited its right to recover the agreed-upon $3 million fee

because it did not hold a California real estate broker's license. (See Bus. &
Prof. Code, § 10131.)[1] We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

In November 2006 Bingo retained GreenLake to assist in identifying and
raising financing to support its business activities.[2] According to the letter
agreement between the parties, Bingo intended to create a separate affiliated
investment entity with an initial debt capitalization of $150 million and was
seeking financing sources to provide capital to "its new or existing entities."
GreenLake was hired to "act as [Bingo's] advisor" in raising the financing,
which was authorized to consist of, but not limited to, "cash, equity,
quasi-equity, mezzanine financing, revolving line of credit, term loan, general
credit facility, mortgage facility, warehouse credit facilities, purchase facili-
ties, participation facilities, portfolio acquisitions or any combination
thereof." GreenLake was also intended to "assist [Bingo] in analyzing,
structuring, negotiating, and closing each Financing" and to "use its best
efforts" to execute the financing. Bingo was to engage its own legal counsel
and, if necessary, an accounting firm to comply with the due diligence
requirements of any financing source.

In a paragraph entitled "Success Fees," Bingo agreed to pay GreenLake "in
cash, due immediately upon closing, Success Fees equal to two percent
(2.00%) of the total proceed or amount" that is "made available and/or
funded" to Bingo from the financing. "If the Financing is based upon a
facility or drawdown type structure, then the Success Fees will be based upon
the Amount that is offered or made available by the Financing Sources to
[Bingo] and not the Amount that [Bingo] elects to draw down." The parties
agreed their relationship would be governed by California law. The agreement
was signed by Peter T. Chang on behalf of GreenLake and David S. Bingham
and Scott G. Switzer on behalf of the Bingo entities.

In January 2007 GreenLake introduced Bingo to FCC, LLC (doing busi-
ness as First Capital Western Region (First Capital)), a potential source of
financing for Bingo. Bingo and First Capital, plus another bank, West LB AG,
New York Branch (West LB), executed a funding proposal letter on January
23, 2007 that contemplated extension of a $150 million credit facility to

---

[1] Statutory references are to the Business and Professions Code unless otherwise indicated.

[2] Bingo Investments describes itself as a "mezzanine" or "bridge" lender offering a
specialized type of real estate secured loan consisting of short-term "bridge" loans that provide
funding based on the value of the real estate being collateralized for the loan. According to
Bingo Investments, its loan portfolio consists of "loans for which it has taken a security
interest in the real property it is loaning against." Centurion Financial acts as Bingo
Investments's originating agent and services its loans.

Bingo Investments II, LLC (Bingo II), a new "bankruptcy-remote," special purpose entity to be formed by the principals of Bingo. With Chang's help, Bingo negotiated a term sheet for a credit facility agreement with First Capital and West LB. Once negotiated, the term sheet was provided to the lawyers for Bingo, on the one hand, and the lenders, on the other, to draft supporting documents for the credit facility. On May 31, 2007 Bingo II entered into a credit and security agreement (CSA) with First Capital and West LB that created a credit facility in favor of Bingo II. To support the contemplated (but not yet executed) loans, Bingo II granted a security interest in its existing assets in favor of First Capital and West LB.[3]

Once the transaction closed, GreenLake requested payment of its 2 percent fee, which, under the terms of the letter agreement, totaled $3 million. In June 2007 Bingo made partial payments totaling $300,000 but refused to make further payments, claiming no fees were due until Bingo II began to draw down on its credit facility. On August 1, 2007 GreenLake filed this lawsuit, asserting causes of action for breach of contract and unjust enrichment. Bingo unsuccessfully demurred to the complaint on the ground Chang was not a licensed real estate broker in California. (See § 10136.) On September 12, 2008, however, the trial court granted Bingo's motion for summary judgment based on the same theory.

## DISCUSSION

### 1. *Standard of Review*

A motion for summary judgment is properly granted only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) We review a grant of summary judgment de novo and decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348 [1 Cal.Rptr.3d 32, 71 P.3d 296].) We view the evidence in the light most favorable to the opposing party, liberally construing the opposing party's evidence and strictly scrutinizing the moving party's. (*O'Riordan v. Federal Kemper Life Assurance Co.* (2005) 36 Cal.4th 281, 284 [30 Cal.Rptr.3d 507, 114 P.3d 753].)

---

[3] On the same date, Bingo and Bingo II entered into a purchase and sale agreement transferring Bingo's interest in the mortgages and mortgaged properties in its existing real estate portfolio to Bingo II; Bingo, Bingo II and West LB executed a servicing agreement and a custodial agreement related to the loans contemplated by the CSA.

## 2. *The Statutory Scheme Governing Licensing of Real Estate Brokers*

Under California's Real Estate Law (§ 10000 et seq.), "[i]t is unlawful for any person to engage in the business, act in the capacity of, advertise or assume to act as a real estate broker or a real estate salesman within this state without first obtaining a real estate license . . . ." (§ 10130.) "The purpose of the licensing requirement is to protect the public from the perils incident to dealing with incompetent or untrustworthy real estate practitioners." (*Schantz v. Ellsworth* (1971) 19 Cal.App.3d 289, 292–293 [96 Cal.Rptr. 783].) Indeed, an unlicensed person who acts as a real estate broker is subject to penal consequences. (See §§ 10139, 10185.) Moreover, section 10136 bars a person "engaged in the business or acting in the capacity of a real estate broker or a real estate salesman" from bringing or maintaining an action "for the collection of compensation for the performance of any of the acts mentioned in this article without alleging and proving he was a duly licensed real estate broker . . . at the time the alleged cause of action arose."

Section 10131 defines a "real estate broker" as one who "does or negotiates to do one or more of the following acts for another or others: [¶] (a) . . . solicits prospective sellers or purchasers of . . . or negotiates the purchase, sale or exchange of real property . . . . [¶] . . . [¶] (d) Solicits borrowers or lenders for or negotiates loans . . . or performs services for borrowers or lenders or note owners in connection with loans secured directly or collaterally by liens on real property . . . . [¶] (e) Sells or offers to sell, buys or offers to buy, or exchanges or offers to exchange a real property sales contract, or a promissory note secured directly or collaterally by a lien on real property . . . ."

Historically, the only exception to the statutory bar to recovering fees for unlicensed brokerage activities concerned those "who simply find[] and introduce[] two parties to a real estate transaction . . . . Such an intermediary or middleman is protected by the finder's exception to the real estate licensing laws . . . ." (*Tyrone v. Kelley* (1973) 9 Cal.3d 1, 8 [106 Cal.Rptr. 761, 507 P.2d 65].) Under the finder's exception a person who simply finds and introduces prospective parties to a real estate transaction may obtain a commission for his or her services without a real estate license. The fee is forfeited, however, if he or she has played any role in negotiating the transaction, no matter how slight. (*Id.* at p. 9; accord, *Preach v. Monter Rainbow* (1993) 12 Cal.App.4th 1441, 1452 [16 Cal.Rptr.2d 320]; *Lyons v. Stevenson* (1977) 65 Cal.App.3d 595, 604–605 [135 Cal.Rptr. 457].) This is the authority relied upon by the trial court in granting summary judgment to Bingo II.

### 3. *The Parties' Contentions*

Bingo contends judgment was proper because GreenLake, by its own admission, acted as a broker in negotiating the CSA on Bingo's behalf. According to Bingo, and as documented in its motion, GreenLake actively negotiated the terms of the CSA and the resulting financing was "secured directly or collaterally" by a security interest in Bingo II's assets (assertedly composed of "equity positions" in real property). (See § 10131, subd. (d).) Accordingly, the finder's exception does not apply, and GreenLake is not entitled to recover any fee for its services.

GreenLake defends its entitlement to the fee on two grounds: First, section 10131 does not apply to the services it provided to Bingo because the CSA established only a drawdown credit facility that itself did not make any loans, instead providing only a structure for Bingo II to obtain loans for particular projects that remained subject to the lenders' review. Because Bingo II has yet to present a qualifying loan to the lenders to draw down the credit facility, section 10136 does not bar an action to recover the fee due under the letter agreement. Second, even if some of the services it provided fall within the scope of section 10131, the intervening decision in *Venturi & Co. LLC v. Pacific Malibu Development Corp.* (2009) 172 Cal.App.4th 1417 [92 Cal.Rptr.3d 123] (*Venturi*) requires a factual inquiry to determine whether GreenLake is entitled to recover a fee for services falling outside the scope of section 10131.

### 4. *Summary Judgment Was Improperly Granted Because a Triable Issue of Fact Exists as to the Services Provided by GreenLake*

In *Venturi, supra,* 172 Cal.App.4th 1417 our colleagues in Division Eight of this court reversed the trial court's entry of summary judgment in favor of a developer that, likewise relying on sections 10130 and 10136, refused to pay the fee of a financial advisor it had retained to assist in locating financing for a large project. Relying on the decision of the Supreme Court in *Marathon Entertainment, Inc. v. Blasi* (2008) 42 Cal.4th 974 [70 Cal.Rptr.3d 727, 174 P.3d 741] (*Marathon*), Division Eight concluded the trial court had correctly ruled the advisor could not recover compensation for providing real estate broker services to the developer but had erred in denying compensation for those services not falling within the scope of section 10130. (*Venturi*, at p. 1421.) Consequently, triable issues of fact relating to which services were barred by section 10136 and which were compensable under the parties' agreement precluded summary judgment. (*Venturi*, at p. 1422.)

Rather than analyze the advisor's claim under the bright-line rule articulated in earlier decisions applying the finder's exception, *Venturi* remanded

the case and directed the lower court to engage in a severability analysis under *Marathon, supra*, 42 Cal.4th 974. (*Venturi, supra*, 172 Cal.App.4th at pp. 1422–1423.) In *Marathon* the Supreme Court reversed summary judgment entered against a talent manager whose actress client had refused to pay his 15 percent managerial fee on the ground he had violated the Talent Agencies Act (Lab. Code, § 1700 et seq.) by soliciting and procuring employment for her without a talent agent's license. (*Marathon*, at p. 982.) After reviewing the language and legislative history of the Talent Agencies Act, the Supreme Court concluded personal managers "remain exempt from regulation insofar as they do those things that personal managers do, but they are regulated under the Act to the extent they stray into doing the things that make one a talent agency under the Act." (*Marathon*, at p. 989.) Consequently, the court evaluated the manager's contract under the doctrine of severability, codified in Civil Code section 1599,[4] which "preserves and enforces any lawful portion of [the] parties' contract that feasibly may be severed." (*Marathon*, at p. 991.)

As the court explained, in deciding whether severance is available to save particular portions of a contract, " '[t]he overarching inquiry is whether ' "the interests of justice . . . would be furthered" ' by severance.' " (*Marathon, supra*, 42 Cal.4th at p. 996, quoting *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 124 [99 Cal.Rptr.2d 745, 6 P.3d 669] (*Armendariz*).) " 'Courts are to look to the various purposes of the contract. If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate.' " (*Marathon*, at p. 996.) As the court had previously explained in *Armendariz*, "Two reasons for severing or restricting illegal terms rather than voiding the entire contract appear implicit in case law. The first is to prevent parties from gaining undeserved benefit or suffering undeserved detriment as a result of voiding the entire agreement— particularly when there has been full or partial performance of the contract. [Citations.] Second, more generally, the doctrine of severance attempts to conserve a contractual relationship if to do so would not be condoning an illegal scheme. [Citations.] The overarching inquiry is whether ' "the interests of justice . . . would be furthered" ' by severance." (*Armendariz*, at pp. 123–124; accord, *Marathon*, at p. 996.) Applying these principles, the *Marathon* court concluded the talent manager's contract was susceptible to severance and remanded the case for further proceedings. (*Marathon*, at p. 997.)

---

[4] Civil Code section 1599 provides, "Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest."

Applying *Marathon* as Division Eight had in *Venturi*, Division Three of this court recently reversed a judgment entered in favor of an apartment owner who had refused to pay the fees of the apartment's property management company because it did not have a real estate broker's license. (*MKB Management, Inc. v. Melikian* (2010) 184 Cal.App.4th 796 [108 Cal.Rptr.3d 899] (*MKB Management*).) The trial court had concluded the property management agreement was unlawful because its principal object contemplated the provision of services for which a real estate broker's license was required. (*Id.* at p. 801, fn. 1.) Reviewing that ruling in light of the severability principles articulated in *Marathon*, the court concluded the real estate licensing statutes "do not state that an unlicensed real estate broker cannot maintain an action to recover compensation for acts for which no license was required, and there is no indication that the Legislature intended to preclude the recovery of compensation for such services or to repudiate the generally applicable doctrine of severability. Moreover, we cannot conclude as a matter of law . . . all of the services provided under the property management agreement were dependent upon or inextricably related to the acts for which a real estate broker license was required." (*Id.* at pp. 804–805.) The court remanded the case for the trial court to consider whether the doctrine of severability applied to the property management agreement, and, if so, which services were compensable.[5] (*MKB Management*, 184 Cal.App.4th at pp. 805–806.)

We agree with our colleagues in Divisions Three and Eight that section 10136 does not bar the recovery of fees for services for which no real estate license was required.[6] Moreover, in the context of this case, we conclude the letter agreement between GreenLake and Bingo did not have as a "central purpose" the provision of illegal services. (See *Marathon, supra*, 42 Cal.4th at p. 996.) As described above, GreenLake was hired to "act as [Bingo's] advisor" in raising "financing," which was authorized to consist of, but not limited to, "cash, equity, quasi-equity, mezzanine financing, revolving

---

[5] The court also reinstated the property management company's cause of action for quantum meruit on the ground the company was permitted to recover fees for services not requiring a real estate broker's license. (*MKB Management, supra*, 184 Cal.App.4th at p. 805.)

[6] Bingo contends GreenLake has forfeited the argument the letter agreement is susceptible to severance analysis by failing to raise it in the trial court. GreenLake did, however, contend the services provided under the agreement did not fall within the scope of section 10131. In addition, whether the letter agreement itself is susceptible to severance analysis is a question of law we may properly consider for the first time on appeal. (See, e.g., *Sheller v. Superior Court* (2008) 158 Cal.App.4th 1697, 1709 [71 Cal.Rptr.3d 207] [parties permitted to raise new issues on appeal involving question of law; "application of the forfeiture rule is not automatic; appellate courts have discretion to excuse such forfeiture"].) Appellate courts are more inclined to find an exception to the general rule of forfeiture when there has been a change in decisional law that affects the rights of the parties. (See *In re Marriage of Moschetta* (1994) 25 Cal.App.4th 1218, 1227 & fn. 12 [30 Cal.Rptr.2d 893].) The decisions in *Venturi* and *MKB Management* were issued long after the trial court granted Bingo's motion for summary judgment.

line of credit, term loan, general credit facility, mortgage facility, warehouse credit facilities, purchase facilities, participation facilities, portfolio acquisitions or any combination thereof." GreenLake was also required to "assist [Bingo] in analyzing, structuring, negotiating, and closing each Financing" and to "use its best efforts" to execute the financing. At the inception of the relationship, it appears neither Bingo nor GreenLake intended the financing to take a form that would necessarily violate section 10136.

■ Thus, a disputed issue of fact exists as to whether any of the services provided by GreenLake fell within the scope of section 10131 and, if so, whether the letter agreement should be enforced to the extent it is not barred by section 10136. As Division Three directed in *MKB Management*, "If a contract is capable of severance, the decision whether to sever the illegal portions and enforce the remainder is a discretionary decision for the trial court to make based on equitable considerations." (*MKB Management, supra,* 184 Cal.App.4th at p. 803, citing *Marathon, supra,* 42 Cal.4th at pp. 992, 996, 998.)

### 5. *Additional Factual and Policy Considerations on Remand*

■ The most difficult question on remand remains how the court can determine whether a particular service provided by GreenLake ran afoul of section 10136. Section 10131 itself offers little help in determining whether, for instance, a particular service is made "in connection with loans secured directly or collaterally by liens on real property." (§ 10131, subd. (d).) Typically courts construe remedial statutes broadly to achieve their purpose— here, the protection of consumers from unprincipled or ignorant brokers. (See, e.g., *California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 294 [65 Cal.Rptr.2d 872, 940 P.2d 323].) Construed broadly, however, this subdivision, which would appear to have been directed at mortgage loan brokers,[7] could swallow virtually any financing arrangement if the security proffered contains an equity position in real estate. In addition, a violation of section 10136 exposes the violator to criminal penalties (see §§ 10139, 10185), a punitive consequence that also cautions against an expansive reading of the categories listed in section 10131. (See, e.g., *Conrad v. Superior Court* (1962) 209 Cal.App.2d 143, 150 [25 Cal.Rptr. 670] ["legislation which imposes a penalty, and particularly those defining crimes must do so with 'a reasonable degree of certainty' "], quoting *In re Newbern* (1960) 53 Cal.2d 786, 792 [3 Cal.Rptr. 364, 350 P.2d 116].)

---

[7] See, e.g., section 10166.01, subdivision (b)(1) (" 'Mortgage loan originator' means an individual who takes a residential mortgage loan application or offers or negotiates terms of a residential mortgage loan for compensation or gain. An individual real estate licensee acting within the meaning of paragraph (d) of Section 10131 is a mortgage loan originator for purposes of this article with respect to activities involving residential mortgage loans.").

Thus, it will be essential for the trial court to unravel the relationship between GreenLake, as the finder and facilitator of the financing, and the underlying security interest contemplated by the CSA. To begin with, GreenLake correctly points out a revolving credit facility is not the same as a standard commercial mortgage loan. Like the CSA here, a revolving credit facility typically functions as a structure within which a series of loans will be made. (See generally Stern, *Structuring and Drafting Commercial Loan Agreements* (A.S. Pratt & Sons 2009) ¶ 1.02[2] et seq.) However, the mere fact no loans have yet been made under the CSA does not mean the state does not have an interest in the structure under which qualifying real estate loans were contemplated to have been made, nor that the licensing requirements of section 10131 are necessarily inapplicable.

Based on the record before us, it is by no means clear loans made under the CSA were necessarily intended or required to be "secured directly or collaterally by liens on real property" (§ 10131, subd. (d)) in a manner that would implicate the state's interest in protecting the public from unprincipled or inept real estate professionals. (See *Schantz v. Ellsworth, supra*, 19 Cal.App.3d at pp. 292–293.) For instance, it is difficult to see Bingo as a vulnerable consumer; Bingo was to engage its own legal counsel and, if necessary, an accounting firm to comply with the due diligence requirements of any financing source. Moreover, given Bingo's theory in this case and its acknowledged participation in mezzanine (or bridge) financing, it is likely one (or more) of the Bingo entities holds a real estate broker's license. Indeed, the record here is devoid of any factual description of the so-called equity positions Bingo has proffered as collateral for the CSA—"positions" we assume fund its business of mezzanine financing.

As explained by one commentator, "[t]ypically, . . . all mezzanine financing refers to debt that is subordinate to another type or class of debt but senior to equity. . . . [¶] In the real estate capital markets, the term 'mezzanine financing' . . . refers to debt that sits between senior debt and the borrower's equity. In this case, mezzanine debt is junior to the mortgage loan but senior to the borrower's equity. A mezzanine loan in the real estate industry typically refers to debt that is secured solely by the mezzanine borrower's indirect ownership of the mortgage borrower—the entity that actually owns the income producing real property. This same underlying real property also serves as collateral for the senior mortgage lender. [¶] *In a mezzanine loan, neither the mezzanine borrower nor lender actually holds any direct real property interest in the underlying land serving as collateral.* Rather, their respective interests are derived solely from the mezzanine borrower's (direct or indirect) ownership of the equity in the underlying mortgage borrower. The mezzanine borrower grants to the mezzanine lender a lien on its equity in the mortgage borrower pursuant to a written instrument (typically a security agreement), and thereafter the mezzanine lender holds an effective lien on the

collateral at least vis-á-vis the mezzanine borrower. [¶] . . . [¶] Since the mezzanine lender's collateral is equity in another entity, the collateral is technically personal property; therefore Article 9 of the Uniform Commercial Code (UCC) applies rather than local mortgage law." (Berman, *"Once a Mortgage, Always a Mortgage"—The Use (and Misuse of) Mezzanine Loans and Preferred Equity Investments* (2005) 11 Stan. J.L. Bus. & Fin. 76, 105–107, fns. omitted, italics added (Berman).)

Bingo II's alleged equity positions in real estate, therefore, may themselves exempt GreenLake from the requirements of section 10136, simply because, as a mezzanine lender, Bingo II has no direct equity interest in the underlying real property.[8] The CSA in turn inserts yet another layer in that the security interest granted to the lending banks is nothing more than an interest in Bingo II's assets, which likely are equity interests in the mezzanine borrowers—not the real property owned by the mezzanine borrowers. There is California authority that collateral so remote from an actual lien on real property is not subject to the strictures of the Real Estate Law. (See, e.g., *Gray v. Horne* (1941) 48 Cal.App.2d 372, 374–375 [119 P.2d 779] [lack of real estate license did not prevent advisor from collecting fee for efforts in resolving indebtedness of defendant even if indebtedness consisted of liens on real property; "it would be entirely improper to hold that one having anything to do with every type and character of lien must first have a real estate broker's license"]; *Layne v. Malmgren* (1929) 99 Cal.App. 742, 745 [279 P. 670] [sale of promissory note secured by deed of trust did not constitute sale or negotiation for sale of real estate within meaning of the Real Estate Law].) Citing this authority, the California Attorney General opined under an earlier version of section 10131 that a person negotiating a loan in which the collateral was a promissory note secured by a lien on real property need not be a licensed real estate broker. (30 Ops.Cal.Atty.Gen. 247, 249–250 (1957) ["[w]e conclude that the fact that a *bona fide* loan transaction involves as security a promissory note secured by a lien on real property will subject the transaction to no additional licensing requirements than would be the case where the promissory note is not so secured"].)[9]

---

[8] Berman argues forcefully the equity position of the mezzanine lender should in fact be treated as a second mortgage position, largely to eliminate the confusion courts and regulatory entities have in monitoring these investments and to avoid the intricate and costly layers of documentation typically used to insulate the lender from the risks associated with the investment, but also to protect the borrower who lacks the right of redemption under the Uniform Commercial Code it would otherwise have under real property law. (See Berman, *supra*, 11 Stan. J.L. Bus. & Fin. at pp. 112–126.)

[9] Interestingly, and persuasively, New York law, which governs the CSA, recognizes the same distinction. (See, e.g., *Eaton Associates v. Highland Broadcasting Corp.* (N.Y.App.Div. 1981) 81 A.D.2d 603, 604 [437 N.Y.S.2d 715] [enforcing fee agreement for financial advisor who prepared refinancing package including mortgage loans; New York equivalent to § 10136 does not "encompass every situation in which an interest in real estate may be part of the transaction"];

Accordingly, on remand a complete factual investigation of the nature of the obligations created by the CSA, as well as the policies and equities at play in enforcing section 10136 against GreenLake in this case, is required.

## DISPOSITION

The judgment is reversed. The case is remanded for further proceedings not inconsistent with this opinion. GreenLake is to recover its costs on appeal.

Zelon, J., and Jackson, J., concurred.

---

*Kreuter v. Tsucalas* (N.Y.App.Div. 2001) 287 A.D.2d 50 [734 N.Y.S.2d 185] [enforcing unlicensed broker's fee agreement for negotiating reduced payoff on existing mortgage]; *Seckendorff v. Halsey Stuart & Co., Inc.* (N.Y.App.Div. 1930) 229 A.D. 318, 320 [241 N.Y.S. 300] ["The securities ultimately issued were of two kinds—mortgage bonds and debentures. Defendants had the right to select the form of securities to be issued if they undertook the financing. It may not be held that they are without liability . . . to pay an originating commission merely, because they subsequently decided that the financing was to be in part through bonds secured by a mortgage lien. . . . Obviously, if plaintiff did not . . . negotiate for a loan on real estate secured or to be secured by a mortgage, his right to compensation is not defeated by the statute."].)