Filed 5/29/13  Business Advisors v. Chicago Title Ins. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| BUSINESS ADVISORS, INC., | D058320 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2009-00093824-CU-BC-CTL) |
| CHICAGO TITLE INSURANCE COMPANY, | |
| Defendant and Appellant. | |

APPEALS from orders of the Superior Court of San Diego County, Ronald L. Styn, Judge.  Reversed and remanded with directions to enter judgment.

David A. Kay for Plaintiff and Appellant.

Douglas W. Stern; Fidelity National Law Group and Jacky Po-Hong Wang for Defendant and Appellant.

I.

INTRODUCTION

Business Advisors, Inc. (Business Advisors), a real estate brokerage, filed a complaint against Chicago Title Insurance Company (Chicago Title) alleging that

Chicago Title breached an escrow agreement as to which Business Advisors was a third party beneficiary. Among other defenses, Chicago Title contended that Business Advisors was statutorily barred from maintaining this action because it had permitted its associate, Jacques Bouzoubaa, to perform unlicensed real estate brokerage services on its behalf, related to the transaction subject to the escrow.[1]

The principal issue that we must decide in this appeal is whether Business Advisors's lawsuit constitutes an action seeking to recover compensation for the performance of real estate brokerage services. Business Advisors contends that it is seeking merely to recover monies owed to it pursuant to the *escrow* agreement, and that it is not seeking to enforce a separate *commission* agreement pursuant to which the monies were placed into escrow. Chicago Title maintains that Business Advisors's suit is one to recover compensation for real estate brokerage services, noting that the escrow agreement states that the payment to be made pursuant to the agreement is for a "real estate brokerage commission." We agree with Chicago Title that the suit is an action seeking to recover compensation for the performance of real estate brokerage services. For reasons that we explain in the body of this opinion, we hold that this conclusion mandates that we direct the trial court to enter judgment as a matter of law for Chicago Title.

II.

FACTUAL AND PROCEDURAL BACKGROUND

---

[1] Chicago Title raised other defenses to the suit, including that the escrow agreement had been modified so as to permit payment to Bouzoubaa, rather than to Business Advisors. These other defenses are not relevant to this appeal.

A.    *The complaint*

In July 2009, Business Advisors filed a complaint against Chicago Title raising a single cause of action for breach of contract.  In that breach of contract claim, Business Advisors alleged that it was a third party beneficiary to a May 18, 2005 escrow agreement (Escrow Agreement) pursuant to which Chicago Title agreed to act as an escrow holder for a transaction between Safari Investments, L.P. ("Seller") and MaNiPe, LLC ("Buyer").  Although not specifically referenced in the complaint, it is undisputed that the transaction involved the sale of real estate and stock related to a business called Aztec Appliance ("Aztec Appliance transaction" or "the transaction").  Business Advisors further alleged that "[u]nder the terms of the Escrow Agreement, a real estate brokerage commission was to be paid to [Business Advisors] in the amount of [$300,000] upon the close of escrow" and that Chicago Title "breached the Escrow Agreement by failing to make payment to [Business Advisors] when and as due under the Escrow Agreement."[2]

---

[2]    Chicago Title filed a cross-complaint against Bouzoubaa as well as MaNiPe, LLC (Manipe), and Manipe's president, Matthew Gordon, in which it sought contribution and indemnification for Business Advisors's claim.  Prior to a jury trial of the underlying complaint, the trial court severed trial of the cross-complaint.  The claims raised in the cross-complaint are not at issue in this appeal.

3

B.      *The trial*

At a jury trial, Chicago Title did not dispute that it had paid the $300,000 commission specified in the Escrow Agreement to Bouzoubaa rather than to Business Advisors.  However, Chicago Title offered several defenses to Business Advisors's breach of contract claim, including that Business Advisors was statutorily precluded from recovering a commission pertaining to the Aztec Appliance transaction because Bouzoubaa had performed unlicensed real estate brokerage services on Business Advisors's behalf related to that transaction.  As discussed in greater detail in parts III.C.2. and III.C.3, *post*, Chicago Title presented overwhelming evidence at trial establishing this defense.  Specifically, undisputed evidence established that Bouzoubaa did not have a real estate license,[3] that Business Advisors's principal owner, George Newman, knew that Bouzoubaa was unlicensed, and that Bouzoubaa performed numerous actions relating to the transaction for which a real estate license was required.

After the close of evidence, Chicago Title filed a motion for a directed verdict on the ground that the evidence pertaining to Bouzoubaa's unlicensed real estate brokerage activities provided a complete defense to Business Advisors's lawsuit.  The trial court took Chicago Title's motion under submission.  The jury subsequently returned a special

_____

[3]     All statutory references are to the Business and Professions Code unless otherwise specified.

A real estate broker's license and a real estate salesperson's license are types of "real estate license[s]."  (§ 10130 ["It is unlawful for any person to engage in the business of, act in the capacity of, advertise as, or assume to act as a real estate broker or a real estate salesperson within this state without first obtaining a real estate license from the department . . . "].)  It is undisputed that Bouzoubaa had neither a real estate broker's license nor a real estate sales license.

4

verdict finding that Bouzoubaa had *not* performed any acts for which a real estate broker's license was required. The jury also found that Business Advisors was a third party beneficiary of the Escrow Agreement, that the Escrow Agreement had not been modified to permit the commission to be paid to Bouzoubaa, that Bouzoubaa had not acted as an agent of Business Advisors with authority to modify the commission payment instruction in the Escrow Agreement, and that Chicago Title had breached the Escrow Agreement. The jury awarded Business Advisors $120,000 in damages.[4]

C.      *The post-verdict proceedings*

After the jury returned its verdict and the parties submitted further briefing, the trial court issued a tentative ruling granting Chicago Title's motion for a directed verdict, which the court treated as a motion for judgment notwithstanding the verdict (JNOV). In its tentative ruling, the trial court cited the applicable statutory law defining real estate brokerage activities and stated that uncontradicted evidence offered at trial demonstrated as a matter of law that Bouzoubaa had performed unlicensed real estate brokerage services. In support of its determination, the court noted that Bouzoubaa had entered into a nondisclosure agreement with the Buyer, drafted and signed a commission agreement with the Buyer, assisted in drafting a consulting agreement related to the transaction, received numerous documents relevant to the transaction from the buyer and seller,

---

[4]      It is undisputed that Bouzoubaa paid Business Advisors $90,000 of the $300,000 commission. Newman testified that he had intended to pay Bouzoubaa $90,000 for his work on the transaction. The jury's award of $120,000 in damages to Business Advisors, corresponds to the remaining portion of the $300,000 commission.

received the Buyer's earnest money and deposited that money into escrow, and "discussed issues and negotiations with [the seller's] attorney."

The trial court also concluded that Bouzoubaa's actions were imputed to Business Advisors as a matter of law, in light of evidence that Bouzoubaa had worked for Business Advisors for many years, had an office at Business Advisors's place of business, and used Business Advisors's forms and letterhead. In the alternative, the court concluded that Business Advisors could not prevail on the ground that it was "justifiably ignorant" of Bouzoubaa's unlicensed real estate brokerage activities. (*Preach v. Monter Rainbow* (1993) 12 Cal.App.4th 1441, 1458 (*Preach*). In support of this conclusion, the court noted that Newman had worked with Bouzoubaa for several years, had previously urged Bouzoubaa to obtain a real estate license, knew that the Aztec Appliance transaction was proceeding, and had met with the Buyer and Bouzoubaa to discuss problems related to the transaction. Finally, the trial court rejected Business Advisors's argument that Chicago Title should be equitably estopped from raising its illegality defense.

After issuing its tentative ruling, the trial court heard oral argument on Chicago Title's motion for JNOV.[5] At the hearing, the court observed that the jury had not been asked any questions on the special verdict form concerning whether Newman was justifiably ignorant of Bouzoubaa's activities. The court then stated, "[T]he argument that there are these additional factual issues that should have gone to the jury I do find a little

_____

5    During oral argument, the trial court explained that its initial ruling had been a tentative ruling.

6

troublesome . . . ."  The court requested supplemental briefing from the parties with respect to this issue.6

That same day, Chicago Title filed a notice of intent to move for a new trial.  In the notice, Chicago Title asserted that the trial court should grant a new trial on a number of grounds, including "[i]nsufficiency of the evidence to justify the verdict."  Chicago Title stated that its motion was based on its motion for a directed verdict/JNOV, among other materials, and that it did not intend to submit additional moving papers in support of its motion for new trial.

Chicago Title subsequently submitted a supplemental brief in which it argued that Business Advisors's knowledge of Bouzoubaa's actions was imputed to Business Advisors as a matter of law in light of Bouzoubaa's employment relationship with Business Advisors.  In the alternative, Chicago Title argued that there was no evidence from which a reasonable jury could find that Business Advisors was justifiably ignorant of Bouzoubaa's actions.  In this regard, Chicago Title argued in part:

> "No rational trier of fact could conclude that Newman was *'justifiably ignorant'* of the fact that the transaction had been put together by someone not licensed.  Newman did not do it.  At a minimum, he chose to be 'gleefully ignorant,' happy to see the

6    The court did not precisely articulate the question that the court wanted the parties to address in their supplemental briefing.  In its supplemental brief, Business Advisors framed the issue to be briefed as, "Does this court have the power to make additional findings of fact for the purpose of granting a motion for judgment notwithstanding the verdict?"  Chicago Title stated in its supplemental brief that the trial court had "inquired as to the consequence of the fact that the jury had not been instructed on, nor been requested to make a factual finding on the claim by [Business Advisors] that [Business Advisors] was 'justifiably ignorant' of the brokerage activities of Jacques Bouzoubaa . . . ."

7

transaction progress, unwilling to inquire how it was able to do so. Abdication of responsibility is not 'justified ignorance.' "

Business Advisors filed a brief in which it acknowledged that the trial court's tentative ruling granting the motion for JNOV was based on "uncontroverted evidence" that Bouzoubaa had performed unlicensed broker related services in the course of the Aztec Appliance transaction. However, Business Advisors argued that the jury could have chosen to give little or no weight to the uncontroverted evidence. Business Advisors also argued that whether Bouzoubaa was its employee could not be determined as a matter of law, and that the court's tentative JNOV ruling improperly relied on findings of fact that the jury had not made.

On August 9, 2010, the court issued a sua sponte ruling denying the motion for JNOV. In its ruling, the court stated:

> "The court, after rereading the *Preach* case, and the papers filed by the attorneys, sua sponte changes its ruling on the JNOV and denies the motion. The court is satisfied that its analysis was more like a motion for new trial, rather than a JNOV. The issues regarding knowledge should have been submitted to the jury and the court was in error by, in effect, making factual findings on these issues. The jury could have decided not to believe any of the testimony of Mr. Bouzoubaa, Mr. Jennings [the Seller's attorney], and the Buyer [Matthew Gordon]."

After further briefing, the court held a hearing on the motion for a new trial. At the hearing, the court stated, "I believe this may be the first motion for new trial I've granted, but I think the evidence was such that I have no alternative. I think it would be clear error for me not to. I am going to grant the motion." The court then issued a formal

ruling granting the motion for new trial, which was nearly identical to the court's tentative ruling granting the motion for JNOV described above.[7]

D.     *The appeals*

Chicago Title timely appealed the August 9 order denying its motion for JNOV. Business Advisors timely appealed the trial court's order granting Chicago Title's motion for new trial.  Chicago Title timely filed a cross-appeal of the order granting its motion for new trial.[8]

III.

DISCUSSION

*The trial court erred in denying Chicago Title's motion for JNOV*

Chicago Title claims that the trial court erred in denying its motion for JNOV.

A.     *General principles of law governing a motion for JNOV*

A trial court must grant a motion for JNOV whenever a motion for a directed verdict for the aggrieved party should have been granted.  (Code Civ. Proc., § 629.) " ' "[T]he power of the court to direct a verdict is absolutely the same as the power of the court to grant a nonsuit." [Citation.]  "A motion for a directed verdict 'is in the nature of

_____

[7]     The sole difference between the trial court's tentative JNOV ruling and its final ruling granting a new trial was that the court indicated that it was granting the motion for new trial on the ground that there was insufficient evidence to justify the verdict.

[8]     It was not necessary for Chicago Title to file a cross-appeal in order to assert on appeal that there exist alternative grounds for affirming the trial court's order *granting* its motion for new trial.  (See *Erikson v. Weiner* (1996) 48 Cal.App.4th 1663, 1671; Code Civ. Proc., § 906.)  In any event, in light of our reversal of the trial court's order denying Chicago Title's motion for JNOV, Business Advisors's and Chicago Title's appeals of the trial court's order granting a new trial are dismissed as moot.

9

a demurrer to the evidence, and is governed by practically the same rules, and concedes as true the evidence on behalf of the adverse party, with all fair and reasonable inferences to be deduced therefrom.' "  [Citation.]'  [Citation.]"  (*Baker v. American Horticulture Supply, Inc.* (2010) 186 Cal.App.4th 1059, 1072.)

Ordinarily, when reviewing a ruling on a motion for JNOV, "an appellate court will use the same standard the trial court uses in ruling on the motion, by determining whether it appears from the record, viewed most favorably to the party securing the verdict, that any substantial evidence supports the verdict.  ' " 'If there is any substantial evidence, or reasonable inferences to be drawn therefrom in support of the verdict, the motion should be denied.' [Citations.]"  [Citation.]'  [Citation.]"  (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284.)

B.      *Applicable substantive law*

1.      *Relevant statutory scheme*

"California has a strict regulatory scheme [for real estate brokers] triggered by even de minimis brokerage services."  (*Independent Cellular Telephone, Inc. v. Daniels & Associates* (N.D. Ca. 1994) 863 F.Supp. 1109, 1118; see also *Consul Ltd. v. Solide Enterprises, Inc.* (9th Cir. 1986) 802 F.2d 1143, 1151, fn. 8 ["*de minimis* brokerage activity in California . . . bar[s] recovery under California law"].)

Section 10130 prohibits individuals from acting as real estate brokers without proper licensure and provides in relevant part:  "It is unlawful for any person to engage in the business of, act in the capacity of, advertise as, or assume to act as a real estate

10

broker . . . within this state without first obtaining a real estate license from the department . . . ."

Section 10131 defines a real estate broker in relevant part as follows:

"[A] person who, for a compensation or in expectation of a compensation, regardless of the form or time of payment, does or negotiates to do one or more of the following acts for another or others:

"(a) Sells or offers to sell, buys or offers to buy, solicits prospective sellers or purchasers of, solicits or obtains listings of, or negotiates the purchase, sale or exchange of real property or a business opportunity."  (Fn. omitted.)

Section 10136 prohibits a person from maintaining an action for the collection of compensation for the performance of real estate brokerage activities without proving that he is duly licensed:

"No person engaged in the business or acting in the capacity of a real estate broker or a real estate salesman within this State shall bring or maintain any action in the courts of this State for the collection of compensation for the performance of any of the acts mentioned in this article without alleging and proving that he was a duly licensed real estate broker or real estate salesman at the time the alleged cause of action arose."

Section 10137 provides that a real estate broker may not compensate an unlicensed person to perform acts for which a license is required.

"It is unlawful for any licensed real estate broker to employ or compensate, directly or indirectly, any person for performing any of the acts within the scope of this chapter who is not a licensed real estate broker, or a real estate salesman licensed under the broker employing or compensating him . . . ; provided, however, that a licensed real estate broker may pay a commission to a broker of another state."

11

Section 10138 criminalizes the paying of a real estate brokerage commission to anyone other than a licensed real estate broker as follows:

> "It is a misdemeanor, punishable by a fine of not exceeding one hundred dollars ($100) for each offense, for any person, whether obligor, escrowholder or otherwise, to pay or deliver to anyone a compensation for performing any of the acts within the scope of this chapter, who is not known to be or who does not present evidence to such payor that he is a regularly licensed real estate broker at the time such compensation is earned."

Section 10139 makes it a crime for any person to act as a real estate broker or real estate salesperson without a license.

### 2. *Relevant case law*

California courts have repeatedly held that the public policy embodied in California's real estate licensing statutes precludes a party from utilizing the judiciary to recover compensation for acts made illegal by this statutory scheme. (See, e.g, *Preach, supra*, 12 Cal.App.4th at p. 1454, quoting *Hahn v. Hauptman* (1930) 107 Cal.App. 739, 740 ["one may not recover upon a contract for services rendered in the commission of acts which are malum prohibitum, 'this upon the ground of an enlightened public policy' "]; *In re Guardianship of Prieto's Estate* (1966) 243 Cal.App.2d 79, 85-86 (*Prieto's Estate*) [" '[W]hen the evidence shows that the plaintiff in substance seeks to enforce an illegal contract or recover compensation for an illegal act, the court has both the power and duty to ascertain the true facts in order that it may not unwittingly lend its assistance to the consummation or encouragement of what public policy forbids' [citation]"]; *Wise v. Radis* (1925) 74 Cal.App. 765, 775 -776 ["No principle of law is

12

better settled than that a party to . . . an illegal transaction cannot come into a court of law and ask it . . . to enforce rights arising out of the illegal transaction"].)

More specifically, California courts have concluded that a real estate broker cannot prevail in an action to recover compensation related to a real estate transaction, if an unlicensed person performed acts requiring a real estate license on behalf of the broker related to such transaction. (*Preach, supra*, 12 Cal.App.4th at pp. 1455-1456; *Prieto's Estate, supra*, 243 Cal.App.2d at p. 86 ["The assumed services in effecting the subject lease being the product of the joint effort of both respondents, the illegality attendant upon [the unlicensed individual's] participation, because he was not a licensed broker, invalidates the whole transaction, and forecloses recovery by either of them"]; *Haas v. Greenwald* (1925) 196 Cal. 236, 247, aff'd (1927) 275 U.S. 490 [trial court properly sustained demurrer to broker's suit to recover compensation based upon agreement calling for real estate brokerage services of both broker and unlicensed individual]; *Firpo v. Murphy* (1925) 72 Cal.App. 249, 253 (*Firpo*) [concluding trial court erred in overruling demurrer to broker's action to recover commission and stating "[i]t is therefore manifest from the various provisions of the act that the law charges the employer with knowledge of the fact whether his salesman has or has not a license and contemplates that no business can be conducted by a broker through a salesman acting in his behalf until a license is procured by [the salesman]"].)

In *Preach, supra*, 12 Cal.App.4th at page 1446, the plaintiff broker (Preach) brought a lawsuit against defendants to recover a real estate commission. Defendants moved for summary judgment on the ground that the agreement was unenforceable due

to Preach's agreement to pay one-third of his commission to an unlicensed person (Singer), who engaged in activities for which a broker's license was required related to the underlying transaction. (*Ibid*.) The trial court granted defendants' motion for summary judgment. (*Id*. at p. 1445.)

On appeal, Preach contended that even if Singer had performed acts for which a broker's license was required, these activities were not relevant to the enforceability of the defendants' agreement to pay a commission to Preach.[9] Preach contented that "his agreement with Singer was separate from his agreement with defendants." (*Preach, supra*, 12 Cal.App.4th at p. 1455.) The *Preach* court rejected this argument, reasoning:

> "[Preach] cannot insulate his agreement with defendants from the Business and Professions Code's proscription against brokers sharing their commissions with unlicensed persons who perform acts for which a license is required by the artifice of making one agreement with Singer and another with defendants. There would be no deterrent to a real estate broker employing unlicensed persons if the only consequence was that the unlicensed person would not be paid by the broker but the broker would receive his or her full fee.
>
> "The purpose of the real estate licensing statutes is to protect the public from the perils incident to dealing with incompetent or untrustworthy real estate practitioners. [Citations.] This purpose would not be served by adopting the theory of [Preach] and the California Association of Realtors that regardless of the unenforceability of his contract with Singer, [Preach's] contract with defendants was unaffected." (*Ibid*.)

---

9    In part III.C.2., *post*, we discuss the *Preach* court's affirmance of the trial court's conclusion in that case that the evidence demonstrated as a matter of law that Singer had performed services for which a real estate license was required. In part III.C.3., *post*, we discuss the *Preach* court's consideration of whether the evidence in that case demonstrated as a matter of law that Preach was "*justifiably* ignorant of Singer's unlawful activities." (*Preach*, *supra*, 12 Cal.App.4th at p. 1458.)

14

C.    *Application*

In its opening brief, Chicago Title maintains that the trial court erred in denying its motion for JNOV in which Chicago Title contended that Business Advisors was statutorily barred from prevailing on its breach of contract claim because Business Advisors's suit was one seeking to recover compensation for the performance of unlicensed real estate brokerage services.  Chicago Title argues that the undisputed evidence presented at trial demonstrated as a matter of law both that Bouzoubaa performed acts related to the Aztec Appliance transaction for which a real estate license was required, and that Business Advisors was not justifiably ignorant of Bouzoubaa's acts.

In its combined respondent's and cross-appellant's opening brief, Business Advisors contends that the trial court properly denied the motion for JNOV because evidence pertaining to Bouzoubaa's acts with respect to the Aztec Appliance transaction is irrelevant to Business Advisors's action to enforce the Escrow Agreement.[10]  We consider Business Advisors's contention first.

---

10    Business Advisors argues that, "The commission agreement between Business Advisors, the buyer and the seller was not part of the escrow and the legality of that contract is not in any way at issue when considering whether the [E]scrow [Agreement] . . . has been breached."

15

1.    *Business Advisors's lawsuit is an action to recover compensation for real estate brokerage services*

Business Advisors's complaint against Chicago Title states that Business Advisors seeks to recover for the breach of the Escrow Agreement mandating payment of a "real estate brokerage commission."  The complaint alleges in relevant part:

> "Under the terms of the Escrow Agreement, *a real estate brokerage commission* was to be paid to [Business Advisors] in the amount of . . . [$300,000] upon the close of escrow, which occurred on or about July 29, 2005.  [¶]  . . .  On or about July 29, 2005, Chicago Title . . . breached the Escrow Agreement by failing to make payment to [Business Advisors] when and as due under the Escrow Agreement."

Further, the Escrow Agreement expressly provides that the Buyer is to pay Business Advisors "a real estate brokerage commission" through escrow.  The Escrow Agreement provides in relevant part:

> "Upon the Close of Escrow and through the Escrow, Buyer shall pay a *real estate brokerage commission* to [Business Advisors] in the amount of [$300,000] pursuant to written commission agreement executed by Buyer on April 29, 2005 with respect to this transaction in accordance with Buyer's separate agreement with said broker(s) . . . ."

In its reply brief, Business Advisors acknowledges that the "commission agreement is . . . the source of the required payment to Business Advisors."  We agree, and that is precisely the point.  Business Advisors's suit to recover the aforementioned "required payment" is a suit to recover the real estate brokerage commission provided for in the commission agreement.  Accordingly, it is clear that Business Advisors "in substance" seeks to recover compensation for real estate brokerage services.  (*Prieto's Estate*, *supra*, 243 Cal.App.2d at p. 86.)

16

Business Advisors raises several arguments in support of its claim that its action is not one seeking to recover compensation for the performance of real estate brokerage services. Business Advisors's primary argument in support of this contention is that this case is analogous to *Denning v. Taber* (1945) 70 Cal.App.2d 253 (*Denning*) and its progeny. In *Denning*, the Court of Appeal concluded that a plaintiff was not precluded from maintaining an action for an accounting of the property of a terminated partnership that the plaintiff had conducted with the defendant without a required license. (*Id*. at p. 260.) The *Denning* court held, "Conceding that the saloon business was conducted illegally because a partnership license was not procured in the names of both partners as required by law, we are satisfied that the plaintiff is nevertheless entitled to maintain this suit for an accounting of assets because it does not necessarily involve the legality of the partnership agreement to conduct the . . . saloon but depends upon the oral agreement to divide the property equally which was made by the parties after the voluntary termination of the business without the aid of court." (*Ibid*.)

In reaching this conclusion, the *Denning* court noted that the failure to obtain a partnership license would generally preclude a court, on public policy grounds, from determining issues between the partners regarding the ownership and division of the business. (*Denning, supra,* 70 Cal.App.2d at p. 257.) However, the *Denning* court stated that it would apply an "exception to the general rule" precluding such a suit when the business "has been completely terminated and one of the parties subsequently expressly agrees to divide in a specified manner the assets in his possession." (*Ibid*.) The *Denning* court explained that this exception is grounded in the following reasoning:

17

"When the illegal transaction has been consummated, when no court has been called upon to give aid to it, when the proceeds of the sale have been actually received, and received in that which the law recognizes as having had value, and when they have been carried to the credit of the plaintiffs, the case is different.  The court is there not asked to enforce an illegal contract.  The plaintiffs do not require the aid of any illegal transaction to establish their case.  It is enough that the defendants have in hand a thing of value that belongs to them. . . .

"[¶] . . . [¶]

"[T]he source from which that property was derived becomes immaterial and the construction of the legality of the defunct contract is unnecessary.  Under such circumstances it may not be said courts are aiding or encouraging the execution or fulfillment of illegal contracts.  A court is not expected to trace the source of property beyond the issues necessar[il]y involved, merely to determine whether it is tainted with illegality so as to punish the parties for violation of the law. . . ."  (*Id*. at pp. 258-259.)

In contrast, in this case, the illegal transaction has *not* been consummated, and the trial court *is* being called upon to give aid to the transaction.  Further, Business Advisors's suit does *not* require a court to "trace the source of property." (*Denning, supra,* 70 Cal.App.2d at p. 259.)  Instead, the source of the property—a commission agreement mandating payment of a real estate brokerage commission—is plain on the face of the Escrow Agreement, as is reflected in Business's Advisors's complaint and its brief in this court.  (Compare with *ibid.* [doctrine mandating that courts refuse to give aid to illegal transaction is limited or else "courts would often be required to assume the impossible burden of determining just how serious or remote the taint may be"].)  In short, neither *Denning*, nor any of the cases following *Denning* that Business Advisors cites in its brief,

18

support the conclusion that permitting Business Advisors to maintain this action is permissible.

Business Advisors also raises a series of arguments in support of its contention that the prohibition against a broker recovering a real estate commission based on the performance of unlicensed brokerage activities should not be applied when the defendant is an *escrow company*, rather than the *obligor* who owes the contractual duty to pay a commission. We acknowledge that the context in which this case arises is unusual.

> "The rule in license cases is most frequently applied to those situations where a firm or person required to be licensed fails to secure a license and sues a third person for services rendered or material furnished. In such event the unlicensed firm or person cannot recover because to do so would be to defeat the very purpose of the licensing statute." (*Norwood v. Judd* (1949) 93 Cal.App.2d 276, 283 (*Norwood*).)

Notwithstanding the unusual circumstances under which this case arises, judicial doctrines that preclude a party from recovering for unlicensed services are based on the notion that a *court* will not facilitate a *plaintiff*'s attempt to recover compensation for an illegal act. (See *Prieto's Estate*, *supra*, 243 Cal.App.2d at pp. 85-86.) These doctrines are "part of the general rule that he who comes into equity must come with clean hands." (*Norwood, supra*, 93 Cal.App.2d at p. 283.) Thus, it is the gravamen of the *plaintiff's claim*, and not the identity of *defendant*, that is the critical factor in determining whether an action is potentially barred by a licensing statutory scheme. We disagree with Business Advisors's contention that the purpose of California's real estate licensing scheme would not be furthered by barring its recovery in this case because, according to Business Advisors, "There is no showing here that the rule barring the payment of an

19

illegal commission was intended to assist an escrow company that paid the wrong person."

Numerous California cases have explained that, " 'The purpose of the licensing requirement is to protect the public from the perils incident to dealing with incompetent or untrustworthy real estate practitioners.' [Citation.]" (*Greenlake Capital, LLC v. Bingo Investments, LLC* (2010) 185 Cal.App.4th 731, 736 (*Greenlake Capital, LLC*).) That purpose is furthered by mandating that a real estate commission is "forfeited . . . if [an unlicensed person] has played any role in negotiating the transaction, no matter how slight." (*Ibid.*)

A broker's willingness to allow an unlicensed person to conduct real estate brokerage activities on its behalf will be deterred by precluding the broker from recovering a commission related to such activities, regardless of whether the broker seeks recovery from the obligor or an escrow company. Therefore, to the extent that Business Advisors knowingly permitted Bouzoubaa to conduct unlicensed real estate brokerage services with respect to the Aztec Appliance transaction (a matter that we consider in parts III.C.2. and III.C.3., *post*), precluding Business Advisors from receiving a commission based on the performance of such services, is fully consistent with the purpose of the statute.

Business Advisors also contends that precluding its recovery in this action would "[e]stablish[] a new rule requiring escrow companies to research the legality of contracts used to place money into escrow," a result that Business Advisors maintains would be "unfair and disastrous for the escrow industry." This argument is unpersuasive because

20

precluding recovery by Business Advisors would not establish a *duty* on the part of escrow companies to determine the legality of contracts used to place money into escrow. Rather, an escrow company has a narrow statutorily prescribed duty not to "deliver to anyone a compensation for performing any of the acts within the scope of this chapter, who is not known to be or who does not present evidence to such payor that he is a regularly licensed real estate broker at the time such compensation is earned." (§ 10138.)[11] Although an escrow company is not under a *duty* to determine the legality of a contract pursuant to which monies are placed in escrow, an escrow company may assert as a *defense* that the licensing scheme at issue forbids a plaintiff from recovering a real estate commission that has been placed into escrow.

Finally, Business Advisors cursorily[12] argues that Chicago Title would be unjustly enriched if it were to prevail in this action. We are not persuaded. Business Advisors's main contention in support of this argument is that Chicago Title violated section 10138 by paying a commission to Bouzoubaa, an individual who lacked a real estate license. The trial court persuasively rejected this argument in its order granting Chicago Title's motion for new trial:

> "In this case [Business Advisors] was in a better position than
> Chicago Title to prevent Mr. Bouzoubaa from performing these

---

[11]  Although not offered in evidence at trial, it is undisputed that the California Department of Insurance cited Chicago Title for a violation of section 10138 based on its payment of the commission to Bouzoubaa, since Bouzoubaa was not a "licensed real estate broker" permitted to receive compensation for real estate brokerage acts.

[12]  Business Advisors's unjust enrichment argument is a single page in its brief and contains no citation to authority.

services. [Business Advisors] allowed Bouzoubaa to perform the services and planned to pay him if the deal closed. While Chicago Title allowed Bouzoubaa to be paid directly, Bouzoubaa would have been paid something in any event because [Business Advisors] concedes that it would have paid Bouzoubaa $90,000. . . . Whether the commission is paid to Business Advisors or directly to Bouzoubaa, public policy would be violated.[13]

"Chicago Title argues it was merely negligent in failing to ascertain whether or not Mr. Bouzoubaa had a broker's license. Chicago Title only had contact with Mr. Bouzoubaa and Chicago Title relied on Mr. Bouzoubaa as the broker and followed his instruction, agreed to by the Buyer, in changing the payee of the commission to Bouzoubaa instead of [Business Advisors].

"On the other hand, Bouzoubaa had worked for [Business Advisors] for years and Mr. Newman was aware of what Bouzoubaa was doing in numerous transactions. There [also] was evidence of Bouzoubaa receiving portions of commissions in other transactions . . . ."

We agree with the trial court's determination that, "Mr. Newman's actions of allowing Mr. Bouzoubaa to commit illegal activities on behalf of [Business Advisors] are more culpable that Chicago Title's failure to ascertain the license status of Mr. Bouzoubaa."[14]

---

13     As noted in part III.B.1., *ante*, section 10137 prohibits a real estate broker from compensating an unlicensed person for performing acts for which a real estate license is required.

14     In so stating, we do not intend to suggest that Chicago Title was without fault in issuing the commission to Bouzoubaa. In addition to violating section 10138 (see fn. 11, *ante*), the jury found that Chicago Title breached the Escrow Agreement, and Chicago Title presents no argument on appeal pertaining to this finding.

    However, in considering the central purpose of the statutory scheme to "protect the public from the perils incident to dealing with incompetent or untrustworthy real estate practitioners" (*Greenlake Capital, LLC*, *supra*, 185 Cal.App.4th at p. 736), we agree with the trial court that Business Advisors's actions in permitting an unlicensed associate to perform brokerage activities on its behalf (see pts. III.C.2. and III.C.3., *post*) undermined that statutory purpose to a far greater extent than did Chicago Title's act in issuing the commission to Bouzoubaa.

22

Courts have concluded that the doctrine of unjust enrichment does not apply to require even the person who received services from a broker to pay a commission that is illegal under statutory law. (See, e.g., *All Points Traders, Inc. v. Barrington Associates* (1989) 211 Cal.App.3d 723, 739 ["[The broker] lastly contends that [the recipient of the broker's services] will be unjustly enriched if the contract is not enforced. However, this court cannot 'resort to equitable considerations in defiance' of the mandate of the Legislature"].) An escrow holder is enriched to a far lesser extent than the recipient of the broker's services. For example, in this case, Chicago Title was not enriched by its failure to pay Business Advisors its commission, since it is undisputed that it paid the commission to Bouzoubaa.

Accordingly, we conclude that the doctrine of unjust enrichment does not apply to permit recovery by Business Advisors as against Chicago Title.[15]

2.      *The evidence presented at trial demonstrated as a matter of law that Bouzoubaa performed acts for which a real estate license is required*

Chicago Title contends that the evidence presented at trial demonstrated as a matter of law that Bouzoubaa engaged in real estate brokerage activities for which a license is required. We agree.

As noted in part III.C.1., *ante*, California law is clear that if a person "takes any part in the negotiations, *no matter how slight*, he is . . . a broker." (*Abrams v. Guston* (1952) 110 Cal.App.2d 556, 557-558, italics added.) For example, in *Preach,*

---

15      Business Advisors did not file any claims against Bouzoubaa in this action. We express no opinion as to how the doctrine of unjust enrichment might apply in an action in which Business Advisors sought to recover damages from Bouzoubaa.

*supra,* 12 Cal.App.4th 1441, a broker (Preach) entered into an agreement with an attorney (Singer) to share a potential commission that Preach might receive in connection with the sale or lease of certain real property owned by defendants. The *Preach* court concluded that the following evidence demonstrated as a matter of law that Singer had acted as a real estate broker with respect to the negotiations to lease the property:

> "On June 11, 1985, Singer met with Gray [a representative of Preach's client] in Singer's office. Singer did not invite Gray, or know that Gray was coming. Singer understood that Gray's purpose in coming was to inform Singer of the status of the negotiations with Home Club [the prospective lessee of the property]. Gray told Singer that they were still 'haggling back and forth on' the terms of the lease. Gray related what had been agreed to and that to which he intended to agree. He told Singer the areas in which they were having a problem reaching an agreement, including 'Israeli inflation.' Gray also consulted Singer about the rental rate being negotiated for the property and the tax effect of a future sale of the property. Singer agreed to talk to Thompson [an employee of Home Club] about waiving a provision for several months of free rent. Singer relayed this information to Thompson. Gray asked Singer to call Thompson 'and attempt to help him [Gray] out.' Singer did so.
>
> "Singer testified that he 'was paving the way for Dudley [Gray] to call Thompson and letting Thompson know in effect what the concerns or what the areas of concern were and what the areas of concern were not.' In his declaration, however, Singer claims that he 'did no more than relay a message as to the areas that Gray wanted to discuss.'
>
> "[¶] . . . . [¶]
>
> "Also on June 11, 1985, Singer wrote to McNulty [president and chief executive officer of Home Club], informing him that Gray had noticed in Home Club's annual statement that Home Club leased property with rental payments based on specified percentages of gross sales, against a monthly minimum, and that Gray was 'extremely interested in putting together a deal on the terms which were discussed as $6.75 net, with a fifteen-year term with 3 five-year options. The only sticking point is going to be setting up some kind

24

of a contingency to provide for runaway inflation.' Singer told
McNulty that he had advised Gray to contact Thompson to set up a
meeting to close the deal." (*Preach, supra*, at pp. 1448-1449.)

The *Preach* court reasoned, "Singer's June 11, 1985, meeting with Gray and
Singer's subsequent communications with Thompson and McNulty are undisputed facts
that leave no room for a reasonable difference of opinion:  Singer continued to
communicate with and advise Gray, McNulty, and Thompson about the substance of their
negotiations, after having introduced them.  Singer's participation in the negotiations was
conduct which constitutes activities beyond the permissible scope of a finder." (*Preach,
supra*, 12 Cal.App.4th at p. 1452.)

In this case, the uncontradicted evidence pertaining to Bouzoubaa's unlicensed real
estate brokerage activities during the 18-month period that he worked on the Aztec
Appliance transaction far exceeded the three contacts that the *Preach* court concluded
established as a matter of law that Singer had acted as a real estate broker.  As the trial
court summarized in both its tentative order granting the motion for JNOV and its final
order granting the motion for new trial:  Bouzoubaa entered into a nondisclosure
agreement with the Buyer, drafted and signed a commission agreement with the Buyer,
assisted in drafting a consulting agreement related to the transaction, received numerous
documents relevant to the transaction from the buyer and seller, received the Buyer's

25

earnest money and deposited that money into escrow, and "discussed issues and negotiations with [the] sellers' attorney."[16]

We would add to the trial court's summary of the evidence that representatives of both the Buyer and the Seller described extensive negotiations concerning the transaction in which Bouzoubaa participated. For example, Matthew Gordon, the Buyer's president, testified that Bouzoubaa helped prepare a letter of intent for the purchase as well as other documents pertaining to the transaction. The Seller's attorney, John Douglass Jennings, Jr., testified that Bouzoubaa was "intimately involved in the transaction," and that Bouzoubaa "engaged in discussion of the issues and negotiations," with people in Jennings's office. Gordon and Jennings both testified that they considered Bouzoubaa to be acting as a real estate broker in the transaction.

In addition, documentary evidence corroborated the testimony concerning Bouzoubaa's brokerage activities, including an e-mail from Gordon instructing Bouzoubaa to "[d]raw up a letter of intent with the basic deal points," a counter letter of intent from Jennings addressed to Bouzoubaa and Gordon, and a letter from Jennings address to Bouzoubaa and Gordon describing "discuss[ions] . . . with . . . Bouzoubaa"

---

16    As noted previously (see pt. II.C., *ante*), the trial court found that the "uncontradicted [evidence] shows that Mr. Bouzoubaa was acting as a real estate broker and not as a finder or 'transaction coordinator.' " The trial court's ruling denying Chicago Title's motion for JNOV was based on the trial court's conclusion that "issues regarding knowledge should have been submitted to the jury." We consider the court's ruling in this regard in part III.C.3., *post*.

concerning a "communication from Mr. Bouzoubaa" related to the transaction. Newman testified that he had never seen any of these documents.[17]

Further, although Chicago Title devoted the bulk of its opening brief to cataloging evidence relevant to proving that Bouzoubaa engaged in real estate brokerage activities, Business Advisors presents no separate legal argument on appeal in support of the contention that a reasonable jury could find that Bouzoubaa did not take "any part in the negotiations, no matter how slight," so as not to come within the scope of California's real estate licensing scheme. (*Preach, supra*, 12 Cal.App.4th at p. 1452.)[18] However, in its statement of facts, Business Advisors does state, without citation to the record, that Newman testified that any "*broker-like functions*" that Bouzoubaa performed were done under Newman's direct supervision. (Italics added.) Such testimony would only strengthen the case for a JNOV, since although a *licensed* real estate salesperson may perform real estate brokerage services while under the employ of a real estate broker (§ 10132), it is undisputed that Bouzoubaa did *not* hold a real estate sales license during

---

[17]     As noted previously, we consider whether Business Advisors was "justifiably ignorant" (*Preach, supra*, 12 Cal.App.4th at p. 1458) of Bouzoubaa's unlicensed real estate brokerage activities in part III.C.3., *post*.

[18]     Chicago Title claims that the trial court erred in refusing Chicago Title's request to provide a number of special instructions to the jury, including an instruction that provided in relevant part, "If the person takes any part in the negotiations, no matter how slight, he is acting as a broker or a salesperson, for which a license is required." We need not determine whether the court erred in failing to provide such an instruction, but we do note that the jury rendered its verdict that Bouzoubaa did not perform any act in the Aztec Appliance transaction for which a real estate license is required, without the benefit of an instruction specifically applying the law cited in the text.

the time he worked on the Aztec Appliance transaction. Thus, any "broker-like

functions" that Bouzoubaa performed, supervised or not, were impermissible.

In sum, we conclude that the evidence presented at trial demonstrated as a matter

of law that Bouzoubaa performed acts for which a real estate license is required.

3. *The evidence presented at trial demonstrated as a matter of law that Business Advisors was not justifiably ignorant of Bouzoubaa's performance of acts for which a real estate license is required*

Chicago Title contends that the trial court erred in concluding that the evidence

presented at trial raised a question of fact as to whether Business Advisors was justifiably

ignorant of Bouzoubaa's unlicensed actions.[19] We agree.

In *Preach, supra,* 12 Cal.App.4th 1441, the court described the commission

sharing agreement at issue in that case as follows:

> "[Preach] learned from Singer that Home Club was looking for
> potential store sites. Plaintiff told Singer that he had spoken to the
> owner of the [defendant's] property regarding selling or leasing that
> property to Home Club. Plaintiff asked Singer to provide an
> introduction to Home Club in connection with the [defendant's]
> property. Because Singer had access to the 'top people in the Home
> Club operation,' plaintiff agreed to pay Singer one-third of any
> commission plaintiff received if Home Club leased the [defendant's]
> property, 'or any other property.' " (*Id*. at pp. 1446-1447.)

The Court of Appeal rejected Preach's claim that Singer's unlicensed real estate

activities were irrelevant to Preach's attempt to enforce the commission agreement merely

because Preach's agreement with Singer was separate from his commission agreement

---

[19] In its ruling denying Chicago Title's motion for JNOV, the trial court stated, "The issues regarding knowledge should have been submitted to the jury and the court was in error by, in effect, making factual findings on these issues. "

with the defendant. (*Preach, supra,* 12 Cal.App.4th at p. 1455; see pt. III.A.2., *ante*.) Further, the *Preach* court concluded that Singer's activities would be imputed to Preach if the defendants were able to establish the existence of a "joint venture" between Singer and Preach. (*Preach, supra,* at p. 1457.) However, the *Preach* court stated that if Preach had been "*justifiably* ignorant" of Singer's unlicensed real estate brokerage activities, then Singer's activities could not serve as the basis for denying Preach recovery of his commission. (*Id.* at p. 1458.) The *Preach* court noted that Preach claimed to have had no knowledge of the actions that the *Preach* court concluded established as a matter of law that Singer had conducted unlicensed real estate brokerage activities. (*Id*. at p. 1449.)

With respect to the issue of justifiable ignorance, the *Preach* court stated:

> "If . . . the trier of fact concludes that [Preach] was *justifiably* ignorant of Singer's unlawful activities [citations], then he would not be in pari delicto and no public policy would be furthered by denying [Preach] the relief he seeks in which case the commission agreement should be upheld." (*Preach, supra,* 12 Cal.App.4th at p.1458.)

The evidence that the *Preach* court concluded demonstrated a triable issue of fact with respect to the question of justifiable ignorance is entirely unlike the undisputed evidence presented at trial in this case. Preach entered into an agreement pertaining to a single transaction with Singer because Singer had access to the " 'top people' " of a company that was a prospective tenant for Preach's client. (*Preach, supra*, 12 Cal.App.4th at pp. 1446-1447.) The Court of Appeal concluded that Singer's three contacts (a meeting, a telephone call, and a letter) with others involved in the transaction,

29

all of which occurred within the period of approximately a single day,[20] constituted unlicensed real estate brokerage activities as a matter of law. (*Id*. at p. 1452.) Preach claimed to have no knowledge of Singer's unlicensed activities. (*Id*. at p. 1449.) The agreement between Preach and Singer was that they would share a commission pertaining to a *single* transaction. (*Preach, supra*, 12 Cal.App.4th at pp. 1446-1447.)

In this case, in contrast, the undisputed evidence presented at trial established that Bouzoubaa had worked closely with Newman for approximately *12 years*. Newman acknowledged at trial that Bouzoubaa had a desk a few feet outside Newman's office, Bouzoubaa had a key to Business Advisors's offices, Bouzoubaa identified himself as Business Advisors's associate, Bouzoubaa received faxes and telephone calls at Business Advisors's offices, and Bouzoubaa used Business Advisors's letterhead. Newman also testified at trial that he had repeatedly urged Bouzoubaa to obtain a real estate license.[21] In addition, unlike in *Preach*, in which Preach claimed that he did not know about three specific real estate brokerage activities that Singer engaged in related to the transaction, all of which occurred on or about a *single day*, the evidence in this case demonstrated that Newman worked with Bouzoubaa on the Aztec Appliance transaction over an *18-month period*. Further, Newman testified that he was the primary person moving the transaction

---

20    The *Preach* court concluded that the evidence demonstrated as a matter of law that Singer had engaged in unlicensed real estate activities that occurred on or about June 11, 1985. (See *Preach, supra*, 12 Cal.App.4th at pp. 1449, 1452.)

21    Newman also acknowledged sending a May 1999 letter to Bouzoubaa urging him to obtain his real estate license. Newman stated in the letter, "I hate to make things more difficult for you than I know they already are, but I can't let this slide until something happens and I get reprimanded, or worse yet, lose my license altogether."

forward during this lengthy period, he attended numerous meetings with Bouzoubaa and the parties related to the transaction, and he recalled having seen a letter of intent addressed to Bouzoubaa pertaining to the transaction. Newman also testified that he intended to pay Bouzoubaa $90,000 for his work on the transaction.

Assuming, without deciding, that there could conceivably be circumstances under which a broker would be *justified* in not knowing about the unlicensed activities of someone acting on its behalf,[22] this is clearly not such a case. In light of the evidence described above, no reasonable jury could find that Business Advisors was ignorant of the extensive real estate brokerage activities undertaken by Bouzoubaa on Business Advisors's behalf, much less *justifiably* ignorant of them.[23]

Accordingly, we conclude that the trial court erred in determining that the evidence presented at trial raised a question of fact as to whether Business Advisors was

_____

[22]    But, cf. *Firpo, supra,* 72 Cal.App. 249, 253: "It is . . . manifest . . . that the law charges the employer with knowledge of the fact whether his salesman has or has not a license and contemplates that no business can be conducted by a broker through a salesman acting in his behalf until a license is procured by him."

[23]    The only argument that Business Advisors makes with respect to this issue in its briefing on appeal is that, "The trial court simply did not agree with the jury's evaluation of Mr. Newman's testimony that he supervised his associate sufficiently closely." This argument fails because the jury was not asked any questions on the special verdict form about Newman's knowledge of Bouzoubaa's activities. Thus, there is no basis upon which to determine how the jury evaluated Newman's testimony in this regard. In any event, even assuming a reasonable jury could find that Newman had no knowledge of Bouzoubaa's unlicensed real estate brokerage activities, no reasonable jury could have found that Newman was *justifiably* ignorant of these activities, for the reasons stated in the text.

31

*justifiably* ignorant of Bouzoubaa's unlicensed real estate brokerage actions, and that this question should have been submitted to the jury.

4.     *Chicago Title was entitled to JNOV on its illegality defense*

We concluded above that Business Advisors's lawsuit is an action to recover compensation for real estate brokerage services. (See pt. III.C.1., *ante*.) We have also concluded that the evidence presented at trial demonstrated as a matter of law both that Business Advisors's associate performed unlicensed real estate brokerage activities on its behalf (see pt. III.C.2., *ante*), and that Business Advisors was not justifiably ignorant of the associate's performance of these unlicensed activities. (See pt. III.C.3., *ante*.) Under these circumstances, the trial court erred in denying Chicago Title's motion for JNOV.[24]

---

[24]     In its reply brief, Business Advisors contends that Chicago Title was required to plead illegality as affirmative defense but did not. Although Business Advisors mentioned in its opening brief that Chicago Title had not pled an illegality defense, it did not raise any claim pertaining to this omission. Under these circumstances, we conclude that Business Advisors has not adequately raised this issue on appeal. (*McCaskey v. California State Auto. Assn.* (2010) 189 Cal.App.4th 947, 978 (["oblique statements [in an opening brief] furnish no reason to overlook the general rule that reviewing courts will not address claims of error first made in the reply brief"].)

    In any event, even if we were to consider the merits of Business Advisors's claim that Chicago Title's failure to plead an illegality defense precludes reversal in this case, we would reject it. (*Prieto's Estate*, *supra*, 243 Cal.App.2d at pp. 85-86 [" 'Whatever the state of the pleadings, when the evidence shows that the plaintiff in substance seeks to enforce an illegal contract or recover compensation for an illegal act, the court has both the power and duty to ascertain the true facts in order that it may not unwittingly lend its assistance to the consummation or encouragement of what public policy forbids. (Citations.) It is immaterial that the parties, whether by inadvertence or consent, even at the trial do not raise the issue. The court may do so of its own motion when the testimony produces evidence of illegality. (Citation.) It is not too late to raise the issue even on appeal.' [Citation.]"].)

IV.

DISPOSITION

The trial court's August 9, 2010 order denying Chicago Title's motion for JNOV is reversed. The matter is remanded to the trial court with directions to grant Chicago Title's motion for JNOV and to enter judgment in favor of Chicago Title. Business Advisors's appeal of the court's order granting a new trial and Chicago Title's cross-appeal of the order granting a new trial are dismissed as moot.

Chicago Title is entitled to recover its costs on appeal.


_____
AARON, J.

WE CONCUR:


_____
HALLER, Acting P. J.


_____
McDONALD, J.